# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ANDRE DESCHAMPS,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No. 3:12-cv-86** |
| **v.** | ) | **Judge Sharp** |
| | ) | |
| **BRIDGESTONE AMERICAS, INC.** | ) | |
| **SALARIED EMPLOYEES** | ) | |
| **RETIREMENT PLAN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Pending before the Court are cross-motions for summary judgment. Plaintiff Andre Deschamps filed a motion concerning his claims under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq., and North Carolina state law. (Docket Nos. 58, 59, 60.) Defendants Bridgestone Americas, Inc., et al., did the same. (Docket Nos. 66, 67, 68.) Both parties move for summary judgment on all of Plaintiff's claims.

For the reasons stated, the Court will GRANT Plaintiff's motion with respect to his claims for equitable estoppel, breach of fiduciary duty, and violation of ERISA's "anti-cutback" provision. The Court will DENY Plaintiff's motion on the claims for contract reformation and the claims brought under North Carolina state law.

The Court will DENY Defendants' summary-judgment motion on Plaintiff's claims for equitable estoppel, breach of fiduciary duty, and violation of ERISA's "anti-cutback" provision. The Court will GRANT Defendants' motion on the claims for contract reformation and the claims brought under North Carolina state law.

# BACKGROUND

This is a dispute over the dates used to calculate Plaintiff Andre Deschamps's pension benefits under Bridgestone's retirement plan ("Plan"). The Court offers some background information to help explain how the case arose.

The following facts are undisputed. On August 8, 1983, Plaintiff became an employee of Firestone. He first worked as a maintenance manager at Firestone's tire plant in Joliette, Quebec. Within two years, he was promoted to Chief Engineer at the Joliette plant. When Bridgestone acquired Firestone in May 1988, the Joliette plant became a Bridgestone facility.

In 1993, Plaintiff began to discuss transferring to another Bridgestone plant in Wilson, North Carolina. He soon traveled to Wilson to interview for a position as Plant Engineer and met with several managers at the plant: George Ruccio (Plant Manager), Charles Russell (Human Resources Manager), Thomas Berg (Director of Manufacturing), and Wayne Hunter (Plant Controller).

During the interview, Plaintiff told the Wilson representatives that he was concerned about losing pension credit for his ten years of service in Joliette. He said that his decision to transfer would probably depend on whether he retained credit for his years at the Joliette plant. After the interview, the Wilson managers discussed Plaintiff's candidacy, including his pension requirement, internally. Russell also discussed the offer with Robert Conger, a Bridgestone employee in the corporate Pension Department.

Ruccio ultimately offered Plaintiff the job. As part of the offer, Ruccio promised that, under the Plan, Plaintiff would be given pension credit back to his original hire date of August 8, 1983. Plaintiff accepted the offer and began working at the Wilson plant on August 1, 1993.

After starting work at the Wilson plant, Plaintiff received periodic written and electronic materials from the Plan about his retirement benefits. These materials all listed an employment-start date of August 8, 1983. Bridgestone's online calculator program—a software platform used to help participants calculate retirement benefits under the Plan—also showed that Plaintiff's employment-start date was August 8, 1983.

Twice—in 2000 and 2003—Continental Tires offered Plaintiff a job as Plant Engineer. The position paid more, in terms of annual salary and bonuses, than Plaintiff's job with Bridgestone. But Plaintiff turned down Continental's offers. The "determinative factor" for turning down the jobs, Plaintiff says, was the higher pension that Bridgestone would provide based on an employment-start date of 1983. (Docket No. 54, p. 7.)

For the next six years after turning down Continental's offer, Plaintiff regularly calculated his accrued benefits under the Plan using Bridgestone's benefit statements and the Calculator Program. Each time he did, the readouts showed that his employment-start date was August 8, 1983.

In July 2010, while using the Calculator Program, Plaintiff discovered that his employment-start date had been changed to August 1, 1993—the day that he began work at the Wilson plant. Plaintiff asked Bridgestone managers about the change. Bill Phillips, Vice President of Labor Relations and Benefits, told Plaintiff that the change was a mistake. He then told Plaintiff that he could appeal the change with the Bridgestone Pension Board. Plaintiff filed his appeal with the Pension Board on September 30, 2010.

In November 2010, the Pension Board upheld the change of Plaintiff's employment-start date. In its opinion, the Board concluded that the Plan's text defined "Covered Employee" as "a United States salaried Employee." (Docket No. 38, Ex. 6.) The Board reasoned that, because

Plaintiff was not a "United States salaried Employee" under the Plan until he transferred to North Carolina, he was not covered by the Plan until he began work at the Wilson plant on August 1, 1993. Plaintiff filed a second appeal, which the Board again denied.

This action followed.

## LEGAL STANDARD

To obtain summary judgment, a party must establish that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmoving party must rely on more than "[c]onclusory assertions, supported only be Plaintiff's own opinions." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008). Rather, the nonmovant must "set out specific facts showing a genuine issue for trial." Harvey v. Campbell Cnty., Tenn., 453 Fed. App'x 557, 561 (6th Cir. 2011). The standard of review for cross-motions for summary judgment is the same as the standard for a motion filed by only one party. Ferro Corp. v. Cookson Grp., PLC, 585 F.3d 946, 949 (6th Cir. 2009).

## ANALYSIS

### I. ERISA Equitable Estoppel

Both parties move for summary judgment on Plaintiff's equitable estoppel claim. The core of that claim is straightforward: Bridgestone's employees and managers promised that the Plan would count, for pension calculation purposes, Plaintiff's years of service at the Joliette

plant.  Or, as Plaintiff puts it, "Defendants promised [Plaintiff] a benefit, he relied on that promise, and now Defendants have reneged on that promise to his undeniable detriment." (Docket No. 60, p. 8.)

The Sixth Circuit has recognized that "equitable estoppel [is] a viable theory in ERISA cases."  Sprague v. Gen. Motors Corp., 133 F.3d 388, 403–04 n.12 (6th Cir. 1998).  To be entitled to equitable estoppel under ERISA, Plaintiff must prove the following elements:

> (1) conduct or language amounting to a misrepresentation of material fact;
>
> (2) awareness of the true facts by Bridgestone;
>
> (3) an intention on the part of Bridgestone that the representation be acted on, or conduct that led Plaintiff to believe that his reliance was so intended;
>
> (4) unawareness of the true facts by Plaintiff; and
>
> (5) detrimental and justifiable reliance by Plaintiff on the representation.

See Bloemker v. Laborers' Local 265 Pension Fund, 605 F.3d 436, 442 (6th Cir. 2010).

## A. Ambiguity

As a threshold matter, the Court must determine whether the Plan's terms were ambiguous.  See Sprague, 133 F.3d at 404 ("[Equitable estoppel] cannot be applied to vary the terms of . . . unambiguous plan documents.").  If the Plan's terms were ambiguous, Plaintiff needs only to prove the traditional equitable-estoppel elements.  Id.  But unambiguous terms would mean a heightened standard for Plaintiff's equitable-estoppel claim.  Specifically, he would have to show three additional elements: (1) a written representation; (2) plan provisions that prohibit individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel.  Bloemker, 605 F.3d at 444.  Whether the language of an ERISA plan is ambiguous is "an objective inquiry."  Crawford v.

Pace Indus. Union-Mgmt. Pension Fund, 2014 WL 509475, at *5 (Feb. 7, 2014) (quoting

Smiljanich v. Gen. Motors Corp., 302 F. App'x 443, 448 (6th Cir. 2008)).

Defendants argue that the "applicable language in the Plan unambiguously states that a 'covered employee' under the Plan is an employee who is 'classified by the Employer as a United States salaried Employee.'" (Docket No. 67, p.14.)  In response, Plaintiff points out that Defendants' definition of "covered employee" is incomplete.  Plaintiff notes that the Plan's definition consists of several other subparts, many of which "contain a number of undefined terms." (Docket No. 73, p. 8.)  Plaintiff also argues that the Plan includes other provisions that "would not lead a reader to conclude that 1983 was, in fact, an incorrect ERISA date." Id.

The Court agrees with Plaintiff.  The Plan's terms are simply too ambiguous to provide sufficient guidance for an employee.  This is especially true for present purposes, where clear definitions of "Covered Employee" or "Commencement of Participation" could be dispositive of the entire case.

Both of those definitions are problematic.  Section 1.1(10) defines "Covered Employee" as "an Employee who is described in paragraph (a)" of that provision, but "not described by paragraph (b)."  Section 1.1(10)(a) includes four descriptions of employees who might be covered under the Plan.[1]  After reading these descriptions, section 1.1(10) does not appear to exclude Plaintiff from coverage.  In fact, one of the descriptions in paragraph (a) states that a "Covered Employee" may be any "foreman [or] supervisor . . . whether or not paid on an hourly basis." (Docket 60, Ex. 8, p. 3.)  This description seems to cover Plaintiff's position in Quebec,

---

[1] Defendants argue that the "applicable language in the Plan unambiguously states that a 'covered employee' under the Plan is an employee who is 'classified by the Employer as a United States salaried Employee.'"  (Docket No. 67, p.14.)  This is flat-out wrong.  There are *five* possible descriptions of "Covered Employee" listed in §1.1(10).  And these descriptions are listed in the disjunctive: a "Covered Employee" could be an employee who fits the description of subsection (i), (ii), (iii), (iv), *or* (v).  See Gencorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 821 (6th Cir. 1999) ("'[O]r' is generally considered a disjunctive term [that] provides alternatives.").

which he described as a "Maintenance Manager." (See Docket 60, Ex. 1, p. 19.) Unfortunately, the Plan does not provide a definition for "foreman" or "supervisor" anywhere, making it difficult to come to any conclusion about the Plan's intended coverage.

Without a clear definition of "Covered Employee," Plaintiff could not necessarily have known when he would first be eligible for his pension. For instance, the "Commencement of Participation" provision states that the Plan begins for a full-time employee "on the date he first becomes a Covered Employee." (Docket 60, Ex. 8, p.20.) Other definitions are just as murky. The Plan states that an employee's "Vesting Service," which determines his eligibility under the Plan, depends on his "Employment Commencement date." (Docket 60, Ex. 8, p. 11.) But in the definition of "Employment Commencement Date," the phrase "a Covered Employee" has been altered by hand to read "an Employee"—a term that is never defined in the Plan. (Docket 60, Ex. 8, p. 6.)

Simply put, the Plan's text offers no clear answer to the central question in this case—the date on which Plaintiff's pension should be calculated. The Court concludes that the Plan's provisions are ambiguous. As a result, Plaintiff need not meet the heightened standard for equitable estoppel.

### B.  Equitable Estoppel Factors

The Court now turns to the five traditional equitable estoppel elements.

### 1.  Conduct Amounting to a Misrepresentation of Material Fact

The first element of Plaintiff's estoppel claim calls for proof that Bridgestone made a misrepresentation of material fact. "A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449

(6th Cir. 2002). Material misrepresentations include "misleading communications to plan participants regarding . . . eligibility under a plan [or] the extent of benefits under a plan." Drennan v. Gen. Motors Corp., 977 F.2d 246, 251 (6th Cir. 1992).

There is little doubt that a reasonable employee would be misled by what Bridgestone told Plaintiff about his eligibility under the Plan. During his interview at the Wilson plant in 1993, Plaintiff spoke with "four or five people" from Bridgestone's management team about his pension. (Docket No. 60, Ex. 1, p. 38.) Plaintiff spoke directly with Russell, the Human Resources Manager for the Wilson plant, and knew that Russell was in contact with Conger, an employee in the Pension Department. Conger "confirmed the terms of employment" for Plaintiff's job offer, including "the crediting of his years of service in the Joliette facility for pension purposes." (Docket No. 64, p. 2.) Throughout the discussion, nobody told Plaintiff "that his years of service in Canada were not covered by the pension plan that he would have been under in Wilson[.]" (Docket No. 60, Ex. 9, p. 45.)

For seventeen years, Bridgestone confirmed Plaintiff's understanding of his employment-start date. Bridgestone mailed him personal benefit statements every January from 1994 through 2000. (Docket No. 60, Ex. 2, pp. 16–22.) Printed on the cover of each of these statements was Plaintiff's ERISA date; on every one, that date is "8/8/83" or "08/08/1983." (Docket No. 60, Ex. 2, pp. 16–22.) Plaintiff's electronic benefit statements were no different. His electronic statement from March 2001 showed that his "service date" was "08/08/1983," and stated that his total ERISA service to date was "17 years, 7 months." (Docket No. 60, Ex. 2, p. 1–2.) The same date appeared on electronic statements in August 2002 (Docket No. 60, p. 5), June 2003 (Docket No. 60, p. 9), and February 2004 (Docket No. 60, p. 15). As Plaintiff says, each these statements were "confirmation[s] . . . that [Bridgestone's managers] were recognizing 1983" as

his employment-start date, "exactly per [his] discussion at the [1993] meeting" at the Wilson plant. (Docket No. 60, Ex. 1, p. 118.)

The Court finds that Bridgestone's statements to Plaintiff were material misrepresentations. Bridgestone's repeated assurances and confirmations of Plaintiff's employment-start date would have influenced any reasonable employee in making the decision about retirement; it is no surprise that they had that effect on Plaintiff.

### 2. Awareness of the True Facts by Defendants

The second element requires Plaintiff to show that Bridgestone's "actions contain[ed] an element of fraud, either intended deception or such gross negligence as to amount to constructive fraud." Bloemker, 605 F.3d at 443. See also Crosby v. Rohm & Haas Co., 480 F.3d 423, 431 (6th Cir. 2007).

Defendants argue that the calculation was the result of a "misunderstanding between Plaintiff and Defendants about his pension benefits." (Docket No. 67, p. 11.) Setting Plaintiff's employment-start date at 1983, they argue, was an "honest mistake," which shows, "at worst[,] misfeasance, not malfeasance." (Docket No. 67, p. 11.)

But Plaintiff points to the internal discussions between Ruccio, Russell, and Conger after Plaintiff's 1993 interview. He argues that Conger, Bridgestone's pension analyst, should have known whether the service credit was consistent with the Plan. Plaintiff also notes that "[o]ther members of Wilson management communicated [Plaintiff's] concern about his service credit to the core senior management at [Bridgestone's] corporate office," yet none of these corporate officers ever" told the Wilson plant's representatives—or Plaintiff—that his service credit would not extend back to 1983. (Docket No. 60, p. 9.) This silence, Plaintiff contends, was so negligent that it constituted constructive fraud. (Docket No. 60, p. 9.)

The Court agrees with Plaintiff. In their responses to Plaintiff's interrogatories, Defendants concede—as they must—that "some of Plaintiff's benefit statements did identify August 8, 1983 as an 'ERISA Date.' " (Docket No. 60, Ex. 4, p. 2–3.) But they offer no explanation as to why that mistake, allegedly "entered by a local HR employee with no meaningful knowledge" of the Plan, persisted for seventeen years. (Docket No. 60, Ex. 4, p. 2–3.) And even if Plaintiff merely misunderstood the Plan, Bridgestone failed to correct that misunderstanding. That failure was, at the very least, "such gross negligence . . . as to amount to constructive fraud." See Trs. Mich. Laborers' Health Care Fund v. Gibbons, 209 F.3d 587, 591 (6th Cir. 2000).

### 3. Conduct Suggesting that Defendants Intended Plaintiff to Act on the Misrepresentations

The third element requires Plaintiff to show that Bridgestone intended him to act on its misrepresentations. Bloemker, 605 F.3d at 442. For this element, Plaintiff points out that the original representation was made as part of a job offer in 1993. He argues that Bridgestone offered him an attractive compensation package in order to entice him to accept the offer.[2]

The Court agrees. Bridgestone made the promise while it was "negotiating with [Plaintiff] for a position [at the] Wilson plant" in 1993. (Docket No. 60, Ex. 9, p. 2.) Russell testified that "one of [Plaintiff's] questions was to [ensure] that he had an uninterrupted [pension] service by making the transfer from Canada to the U.S." (Docket No. 60, Ex. 9, p. 2.) And Ruccio intended for Plaintiff act in reliance on the promise: he wanted Plaintiff to accept the job and begin working at Bridgestone. As Berg said in his declaration, "Mr. Ruccio and Mr. Russell offered employment to [Plaintiff] with one of the conditions being that his employment date for

---

[2] Defendants offer no specific argument for this element. They merely contend that they did not "intend[] to deceive [Plaintiff] about how his U.S. pension benefit at Bridgestone would be calculated." (Docket No. 67, p. 11.)

purposes of pension and retirement benefits would be August 8th, 1983." (Docket No. 63, p. 1–2.)

This satisfies the third element: Defendants intentionally assured Plaintiff of a 1983 employment-start date so that he would accept their offer.  Cf. Pearson v. Voith Paper Rolls, Inc., 656 F.3d 504, 509 (7th Cir. 2011) (finding that a plaintiff could not demonstrate intentional misrepresentation when employer had no incentive to provide incorrect information).

### 4. Plaintiff Unaware of the True Facts

The fourth estoppel element requires Plaintiff to show that he was unaware of the true facts.  Bloemker, 605 F.3d at 444.

Plaintiffs have satisfied this element.  The uncontested record evidence shows that, for seventeen years, Plaintiff had no idea that his employment-start date was meant to be 1993.  In Plaintiff's deposition, he said that "all of a sudden in 2010, . . . the [employment-start] date that showed up was 1993."  (Docket No. 60, Ex. 1, p. 100.)  In an email to human resources representatives, he wrote that he was "really shocked" to find that the date had been changed from 1983.  (Docket No. 60, Ex. 5, p. 1.)  He said that this change came "without any notice, no notification, no nothing."  (Docket No. 60, Ex. 1, p. 100.)

Moreover, Plaintiff could not have figured out the correct calculation on his own.  Every manager he asked told him that his pension would be calculated from 1983, and all of his benefit statements indicated that 1983 was his employment-start date.  Referring to the plan's text would not have suggested anything to the contrary: as the Court has already noted, the Plan's provisions were too ambiguous to provide a clear answer on Plaintiff's employment-start date.  Cf. Cataldo, 676 F.3d at 555 ("[P]laintiffs' reliance on . . . statements that contradict plan documents (*which are unambiguous on the point*) was not justifiable as a matter of law.") (emphasis added).

### 5. Detrimental Reliance on the Misrepresentation

The fifth estoppel element requires Plaintiff to show that he justifiably and detrimentally relied on Bridgestone's misrepresentations. Bloemker, 605 F.3d at 444. A party seeking equitable estoppel in the ERISA context must show "that a defendant's statement . . . influenced the conduct of the plaintiff, causing prejudice." CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1881 (2011) (internal quotation marks omitted).

On this issue, Plaintiff points to his decision to turn down Continental's offers in 2000 and 2003. Plaintiff argues that this decision is enough to show detrimental reliance.

The Court agrees. Defendants concede that "[t]he monthly benefit to which [Plaintiff] would be entitled is lower when 1993 is used as the ERISA date than when 1983 is used." (Docket No. 72, p. 7.) And defendants never seem to dispute that the difference in pension payments influenced Plaintiff's decision to turn down job offers from Continental Tires in 2000 and 2003. (Docket No. 54, p. 27–28.) In his deposition, Plaintiff said that he turned down the offers—which would have paid more in base salary than Bridgestone—because his calculations showed that "the benefits [at Continental] that were offered . . . were less than [at Bridgestone]." (Docket No. 60, p. 80.) This alone is enough to show detrimental reliance on Bridgestone's representations.

In their motion, Defendants contend that Plaintiff was not hurt by his decision to stay at Bridgestone. In particular, they point out Continental's corporate restructuring and mass layoffs that began a few years after Plaintiff received the offers. These facts, they argue, show that Plaintiff was actually better off at Bridgestone than he would have been at Continental.

Yet Defendants' argument overlooks another point: Plaintiff chose to forego *any* alternative employment because of Bridgestone's representation. As the Continental offers

demonstrate, Plaintiff's background and employment history would have made him a qualified candidate for similar positions with higher pay or better benefits. See Pell v. E.I. DuPont de Nemours & Co. Inc., 539 F.3d 292, 303 n.5 (3d Cir. 2008) (finding that a plaintiff, an engineer with long employment history at DuPont, "could have found alternative employment or could have opened his own consulting business" had he known that his employer's representations were incorrect). And had Plaintiff known that his employment-start date began in 1993 instead of 1983, he would have been able to plan for retirement accordingly. See id. at 303 (finding that a plaintiff "relied to his detriment on the [incorrect] pension estimates he received" from his employer by foregoing the chance to "get another job with a better pension, or retire sooner"). In reliance on Bridgestone's promises, Plaintiff did none of these things.

The undisputed facts show that Plaintiff is entitled to summary judgment on his equitable-estoppel claim. The Court will therefore grant Plaintiff's motion on this claim and deny Defendants' motion on the claim.

## II. Breach of Fiduciary Duty

Both parties move for summary judgment on Plaintiff's claim for breach of fiduciary duty. Plaintiff claims that Defendant violated ERISA's fiduciary duties of loyalty, care, and exclusive purpose (Count III). Plaintiff also alleges that Defendant violated ERISA's specific duty not to decrease a participant's accrued benefits, also known as the "anti-cutback" provision (Count II).

### A. Was Bridgestone a Fiduciary?

For both claims, the Court must first determine whether Bridgestone is a fiduciary for ERISA purposes. See 29 U.S.C. § 1104 (providing that, under ERISA, breach-of-fiduciary-duty claims may be brought against fiduciaries only). See McLemore v. Regions Bank, 682 F.3d 414,

422 (6th Cir. 2012) (explaining that fiduciary status is paramount in ERISA cases because a plaintiff may obtain damages and equitable relief from a fiduciary, but only equitable relief from a non-fiduciary).

The Sixth Circuit employs a "functional test to determine fiduciary status." Briscoe v. Fine, 444 F.3d 478, 486 (6th Cir. 2006). A plan fiduciary is one who "exercises any discretionary authority or . . . control" over the plan, its assets, or its administration. 29 U.S.C. § 1002(21)(A). The statute does not require *complete* discretionary control for an employer to be an ERISA fiduciary; instead, an employer or plan administrator is a fiduciary if he exercises *any* discretionary control or authority over the plan. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989); Shy v. Navistar Int'l Corp., 701 F.3d 523, 529 (6th Cir. 2012); Anderson v. Great W. Life Ins. Co., 942 F.2d 392, 395 (6th Cir. 1991) ("[D]iscretion is *not* an all-or-nothing proposition. A plan can give an administrator discretion with respect to some decisions, but not others."). An employer may act in a fiduciary capacity when it misrepresents employees' benefit plans. Varity Corp. v. Howe, 516 U.S. 489, 497–504 (1996); Sprague, 133 F.3d at 388.

Plaintiff argues that Bridgestone acted as a fiduciary when its employees told Plaintiff that he was eligible for an ERISA date of August 8, 1983. Plaintiffs also contend that Bridgestone acted as a fiduciary during the seventeen years that followed that promise.

The Court agrees. Bridgestone acted as a fiduciary when its employees first told Plaintiff that he was eligible for a 1983 ERISA date, as well as when it repeatedly provided the same ERISA date in benefits statements and online materials. Both of these actions involved interpreting the Plan document and making decisions as to Plaintiff's eligibility, making them discretionary functions. See Sprague, 133 F.3d at 405 ("[C]onveying information about the

likely future of plan benefits [is] a discretionary act of plan administration."). As a result, Bridgestone was a Plan fiduciary as defined by ERISA. See 29 U.S.C. § 1002(21)(A).

Defendants argue that Ruccio, as Plant Manager, was not acting as a fiduciary when he told Plaintiff that he was eligible for a 1983 ERISA date. Defendants also argue that Bridgestone never acted as a fiduciary when it provided benefit statements to Plaintiff, since providing those statements is an administrative—and not a fiduciary—function.

Both of Defendants' arguments miss the mark. First, Defendants incorrectly focus on whether Ruccio acted as a fiduciary. Bridgestone itself was the fiduciary, and Bridgestone—not Ruccio—made the misrepresentations to Plaintiff. Ruccio simply spoke on Bridgestone's behalf.

And regardless of whether Ruccio had *actual* authority to make decisions about Plaintiff's pension, Ruccio certainly had *apparent* authority to make those decisions. Managers may be deemed fiduciaries when they have apparent authority to make representations under the plan.[3] See Taylor v. Peoples Nat. Gas Co., 49 F.3d 982 (3d Cir. 1995) (finding that fiduciaries can be liable for the misrepresentations of non-fiduciary agents with apparent authority). Such authority "arises in those situations where the principal causes persons with whom the agent deals reasonably to believe that the agent has authority." Anderson v. Int'l Union, United Plant Guard Workers of Am., 150 F.3d 590, 593 (6th Cir. 1998).

Here, Plaintiff reasonably believed that Ruccio had such authority. Ruccio was in a management position at the Wilson Plant, overseeing a $300 million budget and a workforce of 2,000 employees. He was also the highest-ranking Bridgestone employee present during Plaintiff's 1993 interview at the Wilson Plant. It was reasonable for Plaintiff to believe that Ruccio spoke on behalf of Bridgestone when he promised Plaintiff a 1983 ERISA date.

---

[3] ERISA uses the federal common law's principles on apparent authority. See Anderson v. Int'l Union, United Plant Guard Workers of Am., 150 F.3d 590, 593 (6th Cir. 1998).

What happened over the next two decades underscores the reasonableness of Plaintiff's belief. For seventeen years, Ruccio's promise was confirmed in written and electronic benefit statements. It was confirmed whenever Plaintiff checked his pension on Bridgestone's online calculator program. And it was confirmed again in 2010, when Bill Phillips, Vice President of Labor Relations and Benefits, told Plaintiff that his altered ERISA date was a mistake.

In light of these facts, Bridgestone was a fiduciary for ERISA purposes. The Court now moves on to the elements of Plaintiff's two fiduciary-duty claims.

### B. Breach of Fiduciary Duty of Loyalty

ERISA is "designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983). ERISA accomplishes its purposes by imposing "strict fiduciary duties of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." Akers v. Palmer, 71 F.3d 226, 229 (6th Cir. 1995).

To establish a claim for breach of fiduciary duty of loyalty based on alleged misrepresentations of an employee's benefit plan, Plaintiff must show: (1) that Bridgestone was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that Plaintiff relied on those misrepresentations to his detriment. Pirelli Armstrong Tire Corp., 305 F.3d at 449.

Having established that Bridgestone was an ERISA fiduciary, the Court now turns to the second and third elements: Defendants' material misrepresentations and Plaintiff's detrimental reliance.

On both elements, the parties repeat the arguments they raise with respect to equitable estoppel. Plaintiff argues that Bridgestone's misrepresentations were material because they

influenced Plaintiff's decision to decline higher-paying jobs at Continental. Plaintiff also argues that his decision to turn down those offers constituted detrimental reliance; Defendants reply that Plaintiff was actually better off at Bridgestone than at Continental.

Again, the Court agrees with Plaintiff. Bridgestone made material misrepresentations regarding Plaintiff's ERISA date, leading Plaintiff to believe that his pension calculation would include his service at the Joliette plant. This belief influenced his decision to remain at Bridgestone when Continental offered him higher-paying jobs in 2000 and 2003. And throughout his time at the Wilson plant, Plaintiff chose not to seek any other job offers or make alternative arrangements for his retirement. Bridgestone never corrected Plaintiff's misapprehensions, even as years passed.

Bridgestone breached its fiduciary duty of loyalty.

### C. Anti-Cutback Violation

In Count II, Plaintiff alleges that Bridgestone violated ERISA's "anti-cutback" provision. 29 U.S.C. § 1054(g)(1). The provision states that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." Id.

To show a violation of the anti-cutback provision, Plaintiff must show that (1) Plaintiff's pension benefits qualified as "accrued benefits;" (2) Bridgestone's reinterpretation of the Plan terms constitutes an "amendment" of the Plan; and (3) Plaintiff's accrued benefits decreased because of the amendment. Redd v. Bhd. of Maint. of Way Emps'. Div. of Int'l Bhd. of Teamsters, 2010 WL 1286653, at *5 (E.D. Mich. Mar. 31, 2010).

### 1. Did Plaintiff Have an "Accrued Benefit?"

The first issue is whether Plaintiff had an "accrued benefit" in pension credit that began in 1983. "[A]ccrued benefit[s]" are those "under the plan and . . . expressed in the form of an

annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). The Court uses the Plan's text as a starting point. <u>Thornton v. Graphic Commc'ns Conference of Int'l Bhd. of Teamsters Supplemental Ret. & Disability Fund</u>, 566 F.3d 597, 605–06 (6th Cir. 2009) (noting that the anti-cutback provision "makes plain that the terms of pension plan document(s) in effect while a participant worked for a covered employer dictate his or her 'accrued benefits' ").

To win on his anti-cutback claim, Plaintiff must show that the benefit calculation Bridgestone used from 1993 to 2009 was based on a permissible reading of the terms of the Plan. <u>See</u> <u>Redd</u>, 2010 WL 1286653, at *10 ("It surely is not enough . . . [to] claim that a pension benefit was 'determined under the plan' without any effort to show that this benefit determination rested on some tenable reading of the controlling plan documents."). This entails showing that Bridgestone's interpretation of the plan in 1993—the interpretation that produced his ERISA date of 1983—was not arbitrary and capricious. <u>See</u> <u>Hunter v. Caliber Sys., Inc.</u>, 220 F.3d 702, 709–12 (6th Cir. 2000). This is the "least demanding form of judicial review," under which the Court will uphold a denial of benefits if it is "rational in light of the plan's provisions." <u>Monks v. Keystone Powdered Metal Co.</u>, 78 F. Supp. 2d 647, 657 (E.D. Mich. 2000). <u>See also</u> <u>Davis v. Ky. Fin. Cos. Ret. Plan</u>, 887 F.2d 689, 693 (6th Cir. 1989).

Here, once again, the key issue is the Plan's definition of "Covered Employee"— specifically, whether Bridgestone was correct in determining that Plaintiff was a covered employee during his time at the Joliette plant. On this point, both parties largely repeat their arguments from Plaintiff's equitable estoppel claim. Plaintiff argues that Article I, paragraph 1.1(10)(a) includes a definition of "covered employee" that describes his position at the Joliette plant. He concludes that his pension—calculated from August 1983—constitutes an accrued benefit for anti-cutback purposes.

18

The Court agrees with Plaintiff, and finds that Bridgestone's 1993 interpretation of the Plan was not arbitrary and capricious. Section 1.1(10)(a)(ii) states that a "foreman, supervisor, plant protection Employee, . . . [or] confidential Employee" may be considered a covered employee under the Plan. (Docket No. 60, Ex. 8, p. 2.) Reading that provision to include a plant maintenance manager—as Plaintiff's superiors did in 1993—is perfectly reasonable. And other Bridgestone employees obviously felt the same way: Wayne Hunter, the Plant Controller of the Wilson plant, said that he believed Plaintiff's position at the Joliette Plant would be a "covered employee" under the definition of paragraph (b)(ii). (Docket No. 42 p. 2.)

Defendants counter that the Plan defines a "covered employee" as "a United States salaried employee" only. (See Docket No. 67, p. 22.) They argue that, as a result, "Plaintiff never had any entitlement under the Plan" to a pension accrual that began in 1983. (Docket No. 67, p. 22.) They conclude that Plaintiff's pension service credit from had an "accrued benefit" under the terms of the Plan, so the anti-cutback provision does not apply.

Not so. Section 1.1(10) offers *five* possible descriptions of employees who might be covered under the Plan. (See Docket No. 60, Ex. 8, p. 2–3.) And these descriptions are listed in the disjunctive, suggesting that an employee who satisfies *any* of the descriptions could be a "covered employee." See Gencorp, 178 F.3d at 821. The Plan does not restrict its coverage to "United States salaried employee[s]," despite Defendants' baffling insistence otherwise.

For anti-cutback purposes, Plaintiff's pension service credit began in August 1983. His pension from that point on constitutes an accrued benefit.

### 2. Was Bridgestone's 2009 Interpretation an "Amendment?"

Next, the Court must determine whether Bridgestone's 2009 interpretation of the Plan was an "amendment." See 29 U.S.C. § 1054(g)(1). Plaintiff argues that "Defendants'

reinterpretation of the [Plan]" in 2009 "constitutes an amendment of the [Plan] for anti-cutback purposes." (Docket No. 60, p. 19.) They contend that the working definition of "covered employee"—which, based on the periodic benefit statements, seemed to include Plaintiff—was an original interpretation of the Plan's text; when Bridgestone began restricting foreign-service workers' pension credit in 2009, it was reinterpreting that definition.

The Court agrees. A "reinterpretation of plan language" constitutes an "amendment" under Sixth Circuit precedent. Hunter, 220 F.3d at 712. In Hunter v. Caliber Systems, Inc., the Sixth Circuit held that there was "no reason why an amendment that interprets a plan may not likewise be considered an 'amendment' for purposes of § [1054(g)]." Id. See also Hein v. FDIC, 88 F.3d 210, 216 (3d Cir. 1996) ("An erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of ERISA § [1054(g)]."); DiCioccio v. Duquesne Light & Power Co., 911 F. Supp. 880, 899 (W.D. Pa. 1995) (holding that a significant change in the interpretation of plan's language was an "amendment" for purposes of § 1054(g)).

From 1993 until 2009, Defendants seemingly used a definition of "covered employee" that included Plaintiff's position as a maintenance manager at the Joliette plant. Plaintiff saw evidence of this interpretation many times: from managers, human resources representatives, benefit statements, and Bridgestone's own online calculator program. None of these sources suggested that Plaintiff's pension calculation would be any different than represented. But in 2009, Defendants' human resources employees began changing the ERISA dates of foreign-service employees like Plaintiff. This was a "significant change in the interpretation of the language of the Plan." DiCioccio, 911 F. Supp. at 899.

In their motion for summary judgment, Defendants insist that they "did not reinterpret the Plan," but merely "corrected a clerical mistake in Bridgestone's system." (Docket No. 67, p. 22.) But this argument—even if accurate—is unavailing. The <u>DiCioccio</u> Court found that a plan administrator's decision to suddenly restrict the definition of "compensation" was an "amendment" under § 1054(g), despite the administrator's argument that the change "was intended to correct a mistake in practice which inadvertently developed." 911 F. Supp. at 899. Likewise, the Seventh Circuit found that a "clarification" of a plan provision was nevertheless an "amendment" under § 1054(g). <u>Prod. & Maint. Emps.' Local 504 v. Roadmaster Corp.</u>, 954 F.2d 1397, 1400 (7th Cir. 1992). Other courts have come to the same conclusion time and again. <u>See, e.g.</u>, <u>Cottillion v. United Ref. Co.</u>, 781 F.3d 47, 58 (3d Cir. 2015) ("This . . . interpretation resulted in the improper denial of [the plaintiff's] accrued early retirement benefits and thus violated ERISA's anti-cutback rule."); <u>Abels v. Titan Int'l, Inc.</u>, 85 F. Supp. 2d 924, 937–38 (S.D. Iowa 2000) (finding that an employer's interpretation of plan provision was an "amendment" in violation of the anti-cutback rule); <u>Pickering v. USX Corp.</u>, 809 F. Supp. 1501 (D. Utah 1992) (finding that an administrator's change in the language of a pension plan was an "amendment" for anti-cutback purposes, even though the change had never been referred to as an "amendment").

### 3. Did Plaintiff's accrued benefit decrease because of the amendment?

Finally, the Court must determine whether Plaintiff has shown that his accrued benefits decreased because of Bridgestone's amendment. <u>See</u> <u>Redd</u>, 2010 WL 1286653, at *5. This element is easily satisfied.

As a matter of common sense, Bridgestone's amendment reduced Plaintiff's expected pension benefits: After Bridgestone's human resources employees changed his ERISA date to 1993, he lost a decade's worth of pension credit. And defendants even concede that "[t]he monthly benefit to which [Plaintiff] would be entitled is lower when 1993 is used as the ERISA date than when 1983 is used." (Docket No. 72, p. 7.)

### III. Count Four: Reformation

As an alternative, Plaintiff has asked the Court to reform the Plan in light of Defendants' misrepresentations. Both parties move for summary judgment on Plaintiff's reformation claim.

A court may reform a contract when one party is mistaken and the other commits fraud or engages in inequitable conduct. See, e.g., Cigna Corp., 131 S. Ct. at 1885; Perkins-Campbell Co. v. United States, 264 U.S. 213, 218–19 (1924); Baltzer v. Raleigh & Augusta Air-Line R. Co., 115 U.S. 634, 645 (1885) ("[I]t is well-settled that equity would reform the contract, and enforce it, as reformed, if the mistake or fraud were shown."); Alexander v. Bosch Auto. Sys., Inc., 232 Fed. App'x 491, 498 (6th Cir. 2007).

However, reformation should be reserved for situations in which it is necessary to either correct a mistake or prevent fraud. CIGNA Corp., 131 S. Ct. at 1878; Morales v. Intelstat Glob. Serv., LLC, 554 Fed. App'x 4, 5 (2d Cir. 2014); Skinner v. Northrup Grumman Ret. Plan B, 673 F.3d 1162, 1166 (9th Cir. 2012);

Here, reformation is unnecessary. Because the Court will grant Plaintiff's motion for summary judgment in his equitable-estoppel and breach-of-fiduciary-duty claims, there is no need for further equitable relief to prevent fraud or correct any errors that Bridgestone made.

## IV. Promissory Estoppel and Breach-of-Contract Claims (North Carolina Law)

In addition to his ERISA claims, Plaintiff brings two claims under North Carolina state law: promissory estoppel (Count I) and breach of contract (Count V). Both parties move for summary judgment on each claim. The central question is whether ERISA preempts the claims.

ERISA preempts state law claims in two ways: (1) through express preemption and (2) through complete preemption. See Loffredo v. Daimler AG, 500 Fed. App'x 491, 494 (6th Cir. 2012). Express preemption, codified at 29 U.S.C. § 1144(a), applies equally to all ERISA benefit plans and preempts any state law claims that "relate to any employee benefit plan." Id. It also preempts any "state-law cause of action that duplicates, supplements, or supplants" a remedy available under the statute. Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004).

Complete preemption, by contrast, "converts a state-law claim that could have been brought under § 1132 into a federal claim." Loffredo, 500 Fed. App'x at 495. This usually "arises when a plaintiff dresses up a claim for benefits under a pension plan in state-law clothing." Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1075 (7th Cir. 1992). Complete preemption applies to a state-law contract claim when "the contract in issue is a pension plan." Id. ("[A] complaint about pensions rests on federal law no matter what label its author attaches.")

### A. Breach of Contract

Earlier, Plaintiff moved to amend his original complaint in order to assert a state-law claim for breach of contract, and the Magistrate Judge granted the motion. (See Docket No. 51.) However, the Magistrate Judge's Report and Recommendation noted that "the nature and effect of the . . . promises made by [Bridgestone in 1993] . . . are critical." (Docket No. 51, p. 9 n.3.) If the promises were "not derivative of the Plan," they would not be preempted. (Id.) But if the

promises were merely "clarification[s] of Plaintiff's benefits under the Plan," Plaintiff's claim would be preempted by § 1144(a). (Id.)

Defendants' argument is straightforward. They contend that "the alleged promises made to Plaintiff" did not comprise an "independent agreement or exception to the Plan." (Docket No. 67, p. 26.) Instead, the promises "clarifi[ed] . . . Plaintiff's benefits under the Plan," and therefore are preempted by § 1144(a). (Id.)

The Court agrees. Plaintiff does not seem to dispute that the 1993 assurances about his ERISA date were clarifications of the Plan, rather than independent promises. His brief notes that "the Plan . . . made representations . . . about his pension benefit" and that he "believed these promises were consistent with the Plan." (Docket No. 60, p. 23 n.5.) Additionally, Russell, the Human Resources Manager at the Wilson Plant, said that he "wasn't asking for an exception [to the Plan]" when he promised Plaintiff an ERISA date of 1983; instead, he understood his request to be a clarifying question for Bridgestone's pension department. (Docket No. 67, Ex. 2, p. 4.)

Plaintiff argues that, under Gardner v. Heartland Industrial Partners, LP, 715 F.3d 609 (6th Cir. 2013), the Sixth Circuit allows wide latitude for plaintiffs who bring state-law claims implicating ERISA plans. In that case, the Sixth Circuit held that a plaintiff's state-law claim for tortious interference was not preempted by ERISA. The court reasoned that the claim involved a duty not to interfere with the terms of the benefit plan, but did not involve a duty that "derived from . . . the terms of the [plan.]" Id. at 614.

Plaintiff also cites a case from the Second Circuit in support of his argument: Stevenson v. Bank of New York, 609 F.3d 56 (2d Cir. 2010). (The Gardner court relied on heavily on Stevenson in reaching its own holding. See Gardner, 715 F.3d at 614.) At first glance, Stevenson seems apt. The plaintiff in that case worked for a bank in New York and was a

member of the bank's ERISA plan.  <u>Stevenson</u>, 609 F.3d at 60.  His employer asked him to transfer to an affiliated bank in Switzerland.  <u>Id.</u>  Under the terms of the plan, the plaintiff would have lost his ERISA status when he transferred to Switzerland; in order to induce him into taking the job, the plaintiff's employer promised to maintain his status as a plan participant while he worked in Switzerland.  <u>Id.</u> at 60–61.  The bank reneged on that promise, and the plaintiff sued.  <u>Id.</u>  Ultimately, the Second Circuit found that the plaintiff's claim was not preempted by ERISA.  <u>Id.</u> at 61.  The court pointed out that the plaintiff's status as a participant did not derive from the plan—the plan, in fact, said the opposite—but arose from a "separate promise" made by the bank.  <u>Id.</u>  As a result, the claim "[did] not support a finding of ERISA preemption."  <u>Id.</u>

But this case is different from <u>Stevenson</u>.  There, the plan's terms clearly prevented the plaintiff from remaining a plan participant after he took the job in Switzerland; when the bank promised otherwise, that promise was contrary to the terms of the plan.  Yet the terms of Bridgestone's Plan were never clear.  Had the Plan unambiguously barred plaintiff from receiving credit for his time at the Joliette Plant, the 1993 discussions would constitute a separate promise—one that, like the bank's promise in <u>Stevenson</u>, would involve a legal duty that arose outside of the Plan's terms.  Instead, Bridgestone and Plaintiff understood the 1993 promise as a clarification of the Plan's vague, confusing terms.  This difference is critical: Plaintiff's breach-of-contract action is wrapped up in the meaning of the Plan's terms, so any legal duty that Bridgestone owes Plaintiff as a result of that promise is not "independent of . . . the plan terms." <u>Aetna Health</u>, 542 U.S. at 216.

Plaintiff's state-law breach-of-contract claim is preempted under § 1444(a).  Defendant's motion for summary judgment on Plaintiff's state-law breach-of-contract claim will be granted.

### B. Promissory Estoppel

Defendants also argue that Plaintiff's promissory-estoppel claim is preempted. They contend that both of ERISA's preemption doctrines apply to the estoppel claim.

The Court agrees. It is unclear whether an employee may bring a promissory-estoppel claim under ERISA. See, e.g., Bloemker, 605 F.3d at 436. But the Court need not answer that question here. In either case, Plaintiff's claim fails. If ERISA allows promissory-estoppel claims directly under the statute, Plaintiff's state-law claim impermissibly "duplicates" ERISA's enforcement provisions, and § 1132 completely preempts it. See Loffredo, 500 Fed. App'x at 497. In that case, any effort to amend the complaint would therefore be futile. See Aetna Health, 542 U.S. at 209. And if ERISA does not allow promissory-estoppel claims, Plaintiff's state-law claim would amount to an "impermissible alternative to ERISA's . . . enforcement regime." Loffredo, 500 Fed. App'x at 497. In that case, § 1144 would expressly preempt the claim.

Plaintiff's state-law promissory-estoppel claim is preempted under §§ 1444(a) and 1132. Defendant's motion for summary judgment on Plaintiff's state-law breach-of-contract claim will be granted.

### CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the parties' cross-motions for summary judgment, (Docket Nos. 58 & 66). An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE